## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

  v.

Saddam Samaan Daoud Samaan,

        Defendant.

**MEMORANDUM OPINION
AND ORDER**
Criminal No. 16-265(6) ADM/HB
Civil No. 21-22 ADM

_____

Amber M. Brennan, Assistant United States Attorney, Minneapolis, Minnesota, on behalf of
Plaintiff.

Saddam Samaan Daoud Samaan, pro se.

_____

## I.  INTRODUCTION

This matter is before the undersigned United States District Judge for a ruling on

Defendant Saddam Samaan Daoud Samaan's ("Samaan") Motion under 28 U.S.C. § 2255 to

Vacate, Set Aside, or Correct Sentence ("2255 Motion") [Docket No. 589].  Also before the

Court are Samaan's Motion to Compel Evidence [Docket No. 602]; Motion to Expand Record

[Docket No. 603]; Motion to Compel Bill of Particulars [Docket No. 611]; Motion to Amend

Motion to Compel [Docket No. 624]; and Motion for Evidentiary Hearing [Docket No. 634].

For the reasons stated below, the Motion to Expand Record is granted and all other motions are

denied.

## II.  BACKGROUND

### A.  Procedural History

In October 2016, Samaan and five co-defendants were indicted on the charge of

conspiring to commit bank fraud through participation in a counterfeit check scheme that

spanned from at least October 2009 through December 2012.  Indictment [Docket No. 1].  Three

of the six defendants pled guilty:  Momodu Sesay ("Sesay"), Charles Dean, and Picasso

Dejoachim.  See Plea Agreements [Docket Nos. 216, 220, 239].  Charges against the fourth

defendant, Mohammed Kromah, were dismissed following competency proceedings.  Kromah

Mot. Dism. [Docket No. 412]; Order Dism. [Docket No. 413].

Samaan and Fester Sayonkon ("Sayonkon") proceeded to trial on a Superseding

Indictment adding a count of aggravated identity theft against each of them.  Superseding

Indictment [Docket No. 227]; Second Superseding Indictment [Docket No. 262].  In October

2017, after a five day trial, a jury returned verdicts of guilty against Samaan and Sayonkon for

conspiracy to commit bank fraud (Count 1) and aggravated identity theft (Count 3).  Verdict

[Docket Nos. 359, 360].  In April 2018, Samaan was sentenced to a term of 63 months on Count

1 and 24 months on Count 3, to run consecutively.  Sentencing J. [Docket No. 477] at 2.

Samaan appealed his conviction and sentence, and the Eighth Circuit Court of Appeals

affirmed.  See United States v. Sesay, 937 F.3d 1146, 1151 (8th Cir. 2019).  Samaan's conviction

became final on February 24, 2020, the date the Supreme Court denied his petition for a writ of

certiorari.  Samaan v. United States, 140 S. Ct. 1242; Clay v. United States, 537 U.S. 522, 527

(2003).

In January 2021, Samaan timely filed this 2255 Motion seeking to vacate his conviction

and sentence.  Briefing was completed on June 14, 2021, at which time the Court took this

matter under advisement.

**B.  Counterfeit Check Scheme**

A description of the check fraud scheme is summarized in the Eighth Circuit's decision in

this case:

> In 2008, the Minnesota Financial Crimes Task Force began receiving reports of an uptick in counterfeit checks deposited at banks around the Minneapolis-St. Paul area. An investigation revealed a three-tiered check-fraud scheme. "Check printers" generated counterfeit checks using check-writing software, blank check stock, and valid bank account and routing number information. "Runners" negotiated or deposited the fraudulent checks, often opening their own bank accounts and attempting to withdraw as much cash as possible before the fraud was discovered. "Recruiters" solicited and managed runners, transported them to bank locations, coached them on how to carry out the transactions, and served as the intermediaries between the printers and the runners.

> The Task Force identified Sesay and Sayonkon as two of the primary check printers and recruiters. At trial, Sesay admitted that from October 2009 to December 2012, he generated up to six counterfeit checks per month, and coordinated a team of runners and recruiters to negotiate or deposit those checks. During this same period, Sayonkon printed his own fraudulent checks and recruited runners, but also obtained fraudulent checks from Sesay and shared information and coordinated runners with him.

> In late 2011, Sayonkon recruited Samaan to the conspiracy. Samaan was incarcerated at the time, but he began providing Sayonkon with the names and addresses of contacts in Jordan who might serve as runners and negotiate counterfeit checks. After his release in March 2012, Samaan served as a runner for Sayonkon.

> In June 2012, the Task Force executed a search warrant at an apartment shared by Sesay and another conspirator. Investigators seized two laptops loaded with VersaCheck, a check-writing software designed for small businesses. Data obtained from the computers showed names of payees and other details about the checks generated by the software. Investigators matched these payees to a number of known runners, including Sayonkon. After Sesay agreed to cooperate with authorities, he acknowledged that from October 2009 through June 2012, he and his fellow conspirators caused or intended to cause over $1.4 million in losses at more than forty financial institutions.

Sesay, 937 F.3d at 1149-50.

## C.  Evidence of Samaan's Involvement in the Check Fraud Conspiracy

### 1.  Samaan's May 2102 Arrest

From May 18 through May 23, 2012, Samaan opened three accounts at TCF Bank

("TCF") and two accounts at Wells Fargo Bank ("Wells Fargo") using the identity of an individual named D.S.A.  Trial Tr. Vol I [Docket No. 485] at 123-40; Trial Tr. Vol II [Docket No. 486] at 333-45.  At each bank, Samaan opened a personal checking account in the name of D.S.A., and a linked business account in the name of Daoudco, LLC.  Trial Tr. Vol. I at 123-40; Trial Tr. Vol. II at 333-45.  At TCF Bank, Samaan opened a second business in the name of Alseman Trade, LLC.  Trial Tr. Vol. I at 133-34.  When opening this account, Samaan provided TCF with certificates from the Minnesota Secretary of State showing that Alseman Trade would be doing business as Jarash Fuels and Stop_N_Save.  Id. at 131-36.

On May 23, 2012, Samaan deposited five counterfeit checks totaling more than $60,000 into his new bank accounts at TCF and Wells Fargo.  Trial Tr. Vol. I at 136-38; Trial Tr. Vol. II at 337-343; Tr. Exs. 43B, 46B, 50B.  The checks appeared to be issued by BNY Mellon Asset Servicing, NDA Marketing, and Westfall Auto Sales.  Trial Tr. Vol. I at 138-39; Trial Tr. II at 340-41.  Payees on the checks included Stop_N_Save and Jarash Fuel, Inc.

On May 29, 2012, a TCF fraud investigator contacted the Hennepin County Sheriff's Office about Samaan's activities at the bank.  The TCF investigator asked for assistance because the individual representing himself as D.S.A. was expected to return to a Minneapolis branch later that day.  Trial Tr. Vol. IV [Docket No. 488] at 592.  A deputy responded to the branch and arrested Samaan after bank personnel and surveillance photographs identified him as D.S.A.  Id. at 594.  When he was arrested, Samaan had two counterfeit checks in his wallet totaling nearly $20,000 that appeared to be issued by Westfall Auto Sales and were made payable to Mr. BBQ and Stop_N_Save.  Trial Tr. Vol. IV at 596-97; Trial Ex. 53.  Samaan was charged with possession or sale of stolen or counterfeit checks in violation of Minn. Stat. 609.528.2 and was

4

released on bond.  Gov't Ex. 9 [Docket No. 626, Attach. 9] at 1-2.

### 2. June 2012 Search of Sesay's Computers

Law enforcement executed search warrants on Sesay's apartment in June 2012 and seized two laptops containing the VersaCheck check-printing software.  Sesay, 937 F.3d at 1150; Trial Tr. Vol. I at 69, 71-73; Trial Tr. Vol. II at 217, 219-20.  Information saved in the VersaCheck software showed that Mr. BBQ, Jarash Fuel, Inc., and Stop_N_Save were among the payees on the counterfeit checks that had been created.  Trial Tr. Vol. II at 235-37; 240-41.  One of the payor accounts saved in the VersaCheck program was Visi, Inc.  Id. at 238.

Sesay testified at the Sayonkon/Samaan trial and admitted that his signature was on some of the counterfeit checks that had been recovered from Samaan in 2012, specifically two checks written to Jarash Fuel and Mr. BBQ from Westfall Auto Sales.  Id. at 246-48.

### 3. Samaan's August 2012 Arrest

On August 14, 2012, Columbia Heights police officers stopped at a motel to check the guest registry for outstanding warrants.  Dec. 5, 2016, Mot. Hr'g Tr. [Docket No. 154] at 93-94. The registry showed that a motel guest had used a Minnesota identification card in the name of D.S.A. to rent the room.  Id. at 97; Trial Tr. Vol. III [Docket No. 487] at 553-55.  The officers could not locate the D.S.A. identification card in the Minnesota Department of Motor Vehicles database and determined that the card was fraudulent.  Dec. 5, 2016 Mot. Hr'g Tr. at 97-100. The officers' search of law enforcement databases showed that Samaan had used D.S.A. as an alias, and that the photo on the D.S.A. identification card matched a photo on record for Samaan. Id. at 98-99.

The next day, officers followed Samaan as he drove from the motel and stopped him for a

traffic violation.  Id. at 100-01.  Samaan was driving a Kia Optima that belonged to Kevin

Fitzgerald ("Fitzgerald").  Id.  After Samaan failed to provide a valid identification, officers

arrested him and seized several items from the Kia, including numerous counterfeit checks and

other documents.  Trial Tr. Vol. III at 561, 571-72; Trial Tr. Vol. IV at 571-83.  Police then

executed a search warrant at Samaan's motel room and seized a computer and a printer.  Trial Tr.

Vol. IV at 584.

On August 16, 2012, Special Agent Mike Olson of the United States Secret Service and

three other agents interviewed Samaan at the Anoka County jail where Samaan was being held.

Gov't Ex. 1 [Docket No. 626, Attach. 1].  The agents told Samaan that they believed he was

involved in an ongoing bank fraud conspiracy that included several Liberian males.  Id. at 1-2.

Samaan was shown copies of the counterfeit checks payable to Mr. BBQ and related to Westfall

Auto that were in Samaan's possession in May and had been traced to Sesay's computer in June.

The agents told Samaan that the checks were part of the fraud conspiracy they were

investigating.  Id. at 3.  Samaan responded that the "checks are real."  Id.

Approximately 15 minutes into the interview, Samaan told agents that he was being

represented by attorney Mourad Mohammad ("Mohammad") on a civil matter, but that he still

wanted to talk with the agents.  Id. at 2.  The agents contacted Mohammad, who asked them to

stop their questioning, and the interview ended.  Id. at 2-3.

### 4. Fitzgerald's August 2012 Interview

After interviewing Samaan, the agents interviewed the Kia's owner, Fitzgerald, who was

in custody in the Carver County Jail on an unrelated DWI charge.  Gov't Ex. 2 [Docket No. 626,

Attach. 2].  Fitzgerald told the agents that he met Samaan in March 2012 while the two were in

the Carver County jail.  Fitzgerald stated that Samaan told him he was doing fraudulent "check stuff" by printing fake checks using real bank account numbers.  Id.  Fitzgerald told the agents that someone other than Samaan printed the checks.  Id.  Fitzgerald admitted that he allowed Samaan to make copies of his payroll checks from his former employer, Visi Inc., and his retirement account statements from BNY Mellon TDS.  Id. at 2, 4.  Fitzgerald also stated that after Samaan was released from jail, the two spoke on the phone about the "fake check stuff," sometimes in code.  Id.

### 5.  Jail Calls from Samaan to Sayonkon

After the August 16, 2012 interviews of Samaan and Fitzgerald, BCA criminal intelligence analyst Heather Malsam ("Malsam"), who had been working with Special Agent Olson and others on the check fraud investigation since 2010, made a request to the Carver County jail for copies of phone calls made by Samaan.  Malsam obtained the calls on September 4, 2012.  Gov't Ex. 6 [Docket No. 626, Attach. 6].  In reviewing the list of phone numbers that Samaan had called, Malsam recognized two phone numbers that were associated with Sayonkon, who was known by investigators to be involved in the check fraud scheme.  Trial Tr. Vol. III at 434, 436, 441-42.  After Malsam obtained Samaan's calls, a secret service analyst prepared a "frequency report" of the calls and noted that, other than his girlfriend, the person Samaan had called the most while in Carver County jail was Sayonkon.  Gov't Ex. 8 [Docket No. 626, Attach. 8].

On September 10, Malsam began listening to and transcribing the calls between Samaan and Sayonkon.  Gov't Ex. 7 [Docket No. 626, Attach. 7].  By October 1, 2012, Malsam had transcribed 41 of Samaan's jail calls to Sayonkon.  Id.  The jail calls revealed that in August

2011, Sayonkon's brother, Johnson Sayonkon, called Sayonkon using Samaan's calling card and introduced him to Samaan by placing Samaan on the phone.  Trial Tr. Vol. III at 456; Trial Ex. 25.  During the following months, Samaan and Sayonkon discussed the counterfeit check scheme during a series of calls.  Trial Exs. 26-33.  In the calls, Sayonkon explained how he created counterfeit checks and the steps he took to ensure the checks would be negotiable.  Sayonkon told Samaan that he had completed "a lot of transactions," used several people to help him, and had a "partner" in the endeavor.  Trial Exs. 31, 33.  Samaan asked Sayonkon to send counterfeit checks in large dollar amounts to individuals in Jordan, Samaan's country of origin.  Samaan assured Sayonkon that the individuals would cash the checks in Jordan and send Samaan the proceeds, which he would share with Sayonkon.  Trial Exs. 26-28.  Sayonkon agreed and assured Samaan that he had sent the checks to Jordan as instructed.  Trial Exs. 27-30.

**D.  Target Letter and October 2, 2012 Proffer**

On August 17, 2012, the day after Samaan's interview with the secret service agents, an Assistant United States Attorney ("AUSA") issued a target letter for Samaan.  Gov't Ex. 3 [Docket No. 626, Attach. 3].  The target letter stated that Samaan was "designated as a target of a federal investigation involving Bank Fraud and Money Laundering" and that the letter was intended to provide Samaan with an "opportunity to resolve the matter prior to indictment."  Id.

On October 2, 2012, Saddam and Mohammad met with several government agents and an AUSA for a proffer session.  Gov't Ex. 5 [Docket No. 626, Attach. 5] at 1.  During the session, Samaan stated that he was introduced to Sayonkon through Johnson Sayonkon when Samaan and Johnson Sayonkon were in the Carver County jail.  Id.  Samaan told the agents that Sayonkon produced counterfeit checks using account information that Samaan provided.  Id. at

1-3.

After the October 2, 2012 proffer session, Samaan agreed to assist investigators in obtaining evidence against co-conspirators in the case, including Sayonkon. During the next several months, Samaan met with agents to provide them with information about Sayonkon's activities and to conduct monitored transactions with Sayonkon. Attorney Mohammad communicated by email with agents and prosecutors about Samaan's assistance in the investigation. Mohammad forwarded updates to the Hennepin County Attorneys' Office when requesting continuances and a possible resolution of the state charges pending against Samaan. See Def. Exs. 16-26 [Docket No. 606, Attach. 1] at 46-56.[1] After approximately 10 months of working with the agents, Samaan's relationship with them deteriorated and the agents ended their work with him. Mot. Dism. Hr'g Tr. [Docket No. 323] at 141; Jan. 4, 2021 Letter to Court [Docket No. 591] at 4-5.

Samaan's relationship with his attorney Mohammad also soured, and Samaan filed an ethics complaint against him in 2015. Jan. 4, 2021 Letter to Court at 5. The Minnesota Supreme Court disbarred Mohammad in February 2019 after adopting the findings of a referee who found that Mohammad committed misconduct in matters involving 11 clients. In re Disciplinary Action Against Mohammad, 923 N.W.2d 1 (Minn. 2019). The conduct included "misappropriating $12,837 from three clients, failing to return unearned fees to clients, failing to place clients' funds in trust, failing to account for the use of clients' funds, failing to properly document the receipt of cash payments from clients, failing to return client files and materials,

---

[1] Page numbers in this citation reference the page number in the CM/ECF banner at the top of the page.

9

failing to diligently handle client matters, failing to communicate with clients or their designated representatives, engaging in representation despite a conflict of interest, and failing to appear in court." Id.

**E. Motion to Dismiss**

After Samaan was indicted in October 2016, the Court appointed Gary Wolf ("Wolf") to represent him. In March 2017, Samaan moved to dismiss the Indictment. Mot. Dism. [Docket No. 245]. Samaan argued he had been promised full immunity from prosecution in exchange for his cooperation in the investigation. Id.

An evidentiary hearing on the motion to dismiss was held in May 2017 before Magistrate Judge Kate M. Menendez. Judge Menendez heard testimony from Samaan, Mohammad, two AUSAs, and three investigators involved in Samaan's October 2, 2012 proffer session. See Mot. Dism. Hr'g Tr. at 19-145. Samaan testified that Mohammad had told him he would be given full immunity and would not be prosecuted if he cooperated in the investigation. Id. at 24-25, 28-29, 31. Mohammad was called as a Government witness and testified that he never told Samaan that Samaan would receive full immunity from prosecution, because such a deal was never offered by the Government. Id. at 102-03, 115, 117. Both AUSAs disavowed any agreement for full immunity. They testified that deals for full immunity are extremely rare and require special approval from the Justice Department, and that the AUSAs would have remembered if such a deal had occurred with Samaan. Id. at 138-39.

The parties did not dispute that a written agreement was signed during the October 2, 2012 interview, but no party could produce an executed agreement documenting the terms of Samaan's cooperation. R&R [Docket No. 281] at 7. Mohammad was able to locate an unsigned

September 28, 2012 proffer in his electronic files, but he did not have an executed copy of the agreement. Id.; Gov't Ex. Ex. 4 [Docket No. 626, Attach. 4]. The Government could not locate any written agreement from the meeting. Id. However, the Government stated during the hearing that it considered itself bound by the terms of the September 28, 2012 draft proffer letter. Id. at 2 n.1.

In June 2017, Judge Menendez issued a Report and Recommendation ("R&R") concluding that the United States had not promised Samaan immunity from prosecution and recommending denial of the Motion to Dismiss. R&R at 9-11. Judge Menendez declined to opine about the precise terms of any agreement reached at the October 2, 2012 meeting, but found that "it is more likely than not that the agreement Mr. Samaan signed on October 2, 2012 was a proffer letter containing the same standard terms as those reflected" in the September 28, 2102 draft proffer letter. Id. at 2 n.1. This Court adopted the R&R on June 28, 2017. Order Adopting R&R [Docket No. 291].

## F. Present Motion

In this 2255 Motion, Samaan claims that his conviction and sentence must be vacated because: 1) the Government engaged in prosecutorial misconduct; 2) the lawyers who represented him provided ineffective assistance of counsel; and 3) Columbia Heights police officers' search of the motel guest registry violated his Fourth Amendment rights.

## III. DISCUSSION

### A. Legal Standards

#### 1. Section 2255

28 U.S.C. § 2255 provides a person in federal custody with a limited opportunity to

collaterally attack the constitutionality, jurisdictional basis, or legality of their sentence.  See United States v. Addonizio, 442 U.S. 178, 185 (1979).  "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice."  Walking Eagle v. United States, 742 F.3d 1079, 1081-82 (8th Cir. 2014) (quoting United States v. Apfel, 97 F.3d 1074, 1076 (8th Cir. 1996)).

**2. Ineffective Assistance of Counsel**

"To establish ineffective assistance of counsel within the context of section 2255 . . . a movant faces a heavy burden."  Apfel, 97 F.3d at 1076.  A defendant must show that "(1) his attorney's performance failed to conform to the degree of skill, care, and diligence of a reasonably competent attorney; and (2) he was prejudiced by the attorney's poor performance."  Pierce v. United States, 686 F.3d 529, 531 (8th Cir. 2012) (citing Strickland v. Washington, 466 U.S. 668 (1984)).  The defendant must overcome the "strong presumption" that his counsel provided reasonable assistance.  Id.  Overcoming that presumption requires a showing that, "in light of all the circumstances, the lawyer's performance was outside the range of professionally competent assistance."  Cox v. Norris, 133 F.3d 565, 573 (8th Cir. 1997).  If the defendant can show his counsel's performance was inadequate, he then must show that, but for the deficient performance, the outcome of his case would have been different.  Id.

**B. Analysis**

In the memorandum supporting his 2255 Motion, Samaan lists 12 grounds for relief.  See generally Def.'s Mem. Supp. Mot. [Docket No. 601].  In addition, Samaan's 2255 Motion includes a claim that the attorney who represented him during sentencing and on appeal provided

ineffective assistance of counsel.  See 2255 Motion; Jan. 4, 2021 Letter to Court at 17-18.  Each

of Samaan's claims is addressed below.

**1.  Grounds 1, 2, and 11:  Prosecutorial Misconduct and Due Process Violations**

Samaan claims in Ground 1 that the Government engaged in misconduct and violated his

Sixth Amendment right to counsel because prosecutors knew that Mohammad was not

"licensed" in federal court.  He alleges prosecutors concealed this information from Samaan and

allowed an unlicensed lawyer to represent him during a critical stage of the proceedings.  Def.'s

Mem. Supp. Mot. at 4-12, 42-43.  Samaan contends Mohammad was not licensed because he had

not been admitted to the federal bar at the time that he represented Samaan in the federal

investigation.

This argument fails because Mohammad was licensed in Minnesota and was authorized

to practice law within the jurisdiction when he represented Samaan.  Mohammad was not

required to be admitted to the federal bar before advising Samaan on federal criminal law,

because the Local Rules for the U.S. District Court of Minnesota require admission to the federal

bar only for attorneys who "appear or participate in a trial or hearing" before the court.  See D.

Minn. Local Rule 83.5(a)(2).  Mohammad did not appear or participate in any hearing before the

Court when he represented Samaan during the investigative phase of this case.  To the extent that

prosecutors knew Mohammad was not admitted to the federal bar, they did not commit

misconduct by withholding this information from Samaan.

Samaan also argues in Ground 1 that evidence derived solely from his proffer and his

cooperation with agents was used to indict, convict, and sentence him, and that use of the

evidence violates Kastigar v. United States, 406 U.S. 441 (1972).   Def.'s Mem. Supp. Mot. at

13-43.  In Kastigar, the Supreme Court held that when a person provides compelled testimony under a grant of immunity and is later prosecuted, the prosecution must show that "the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony."  Kastigar, 406 U.S. at 460.

Samaan did not provide compelled testimony.  Rather, he gave a consensual interview under a proffer agreement.  Thus, it is questionable whether Kastigar applies.  See United States v. Baez, No. 17-135, 2018 WL 6051280, at *5 (D. Minn. Aug. 31, 2018), report and recommendation adopted, No. 17-135(2), 2018 WL 5307826 (D. Minn. Oct. 26, 2018), aff'd, 983 F.3d 1029 (8th Cir. 2020) ("A proffer agreement, which promises limited immunity on specific terms, does not necessarily raise the same Fifth Amendment compelled testimony concerns that the blanket statutory immunity at issue in Kastigar does.").

Even if Kastigar did apply, the record establishes that Samaan was charged, convicted, and sentenced based solely on evidence and conduct the Government had learned of before Samaan's October 2, 2012 proffer.  Specifically, in May 2012, Samaan was arrested for depositing and possessing counterfeit checks that agents determined in June 2012 could be traced to Sesay's computer.  In August 2012, Samaan was again arrested and had counterfeit checks and other evidence in his possession that tied him to the conspiracy.  On August 16, investigators interviewed Fitzgerald, who told them Samaan was doing "check stuff" and that they sometimes spoke about it on the phone when Fitzgerald was in jail.  In September 2012, nearly a month before Samaan's proffer, investigators learned of Samaan's connection with Sayonkon when they obtained Samaan's jail calls, noted the frequency of Samaan's calls to Sayonkon, and transcribed the calls.  Accordingly, Samaan cannot establish a Kastigar violation.

14

In Ground 2, Samaan claims that Mohammad was representing Fitzgerald during the time that Fitzgerald was providing agents with information against Samaan, and that the Government committed prosecutorial misconduct by concealing this information from him. Def.'s Mem. Supp. Mot. at 46-51. As evidence that Mohammad was representing Fitzgerald, Samaan relies on a spreadsheet listing Fitzgerald's jail calls from March 2012 to July 2012, when he was in jail for a DWI. The spreadsheet shows that Fitzgerald dialed Mohammad's phone number 66 times during this timeframe. Def. Ex. 92 [Docket No. 606, Attach. 3] at 59-94.[2] However, the calls precede the investigators' interactions with Samaan and Fitzgerald related to the counterfeit checks. Agents did not approach Mohammad and Fitzgerald about the counterfeit checks until August 16, 2012, after Samaan had been arrested by Columbia Heights police. There is no evidence that Mohammad ever contacted investigators or prosecutors about Fitzgerald, or that Fitzgerald ever claimed to be represented by Mohammad.

Samaan claims in Ground 11 that the Government suppressed evidence and impeachment material favorable to him, and that the suppression resulted in due process violations under Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972). Def.'s Mem. Supp. Mot. at 173-83. The Court has considered Samaan's litany of arguments and concludes that the Government did not suppress evidence or impeachment material that was favorable to Samaan, and there is no merit to any of these arguments.

### 2. Ground 3:  Constructive Denial of Counsel Prior to Indictment

Samaan argues that Mohammad's representation of him during the investigative phase of

---

[2] The page numbers in this citation reference the page number in the CM/ECF banner at the top of the page.

this case amounted to a constructive denial of counsel during a critical stage in the proceedings. Samaan bases this claim on his assertions that Mohammad was unlicensed and was representing Fitzgerald during the time he implicated Samaan.  For the reasons discussed above, these assertions lack merit.

Samaan also contends in Ground 3 that Mohammad deceived Samaan into cooperating by telling him that his cooperation was in exchange for full immunity.  Samaan raised this argument in his motion to dismiss, and after hearing testimony from Samaan, Mohammad, and others the argument was rejected.  The Court concluded that Samaan was not told he would receive full immunity in exchange for his cooperation.  Mohammad's representation of Samaan was not a constructive denial of his right to counsel.

Samaan also cannot show that Mohammad's representation of him was ineffective under the Strickland test.  Even if Mohammad's representation fell below an objective standard of reasonableness, Samaan cannot satisfy the "prejudice" prong of the Strickland test, because the Government's case was based solely on information it had learned before Samaan's October 2, 2012 proffer.  None of the information Samaan provided during his relationship with Mohammad was used in the Government's case against him.

### 3.  Grounds 4-8, 10, 12: Conflicts of Interest, Ineffective Assistance of Trial Counsel

In Grounds 4 and 5, Samaan argues that Wolf, the attorney appointed to represent Samaan after his indictment in 2016, was a close friend and mentor to Mohammad during the time Mohammad represented Samaan, and that this friendship and business relationship created a conflict of interest.  Def.'s Mem. Sup Mot. at 67-101.

As evidence of the close relationship between Wolf and Mohammad, Samaan contends

16

that Wolf supervised Mohammad when the two represented a federal criminal defendant together

in another case from 2012 through 2014, and that Wolf also represented Mohammad on a pro

bono basis on a state domestic abuse charge.  Samaan argues at the time Wolf represented

Samaan, he knew that Mohammad had represented Samaan without being admitted to the federal

bar, and also knew that the Board of Ethics was investigating Samaan's ethics complaint against

Mohammad.

Samaan argues that Wolf wanted to protect Mohammad in the ethics investigation and to

avoid implicating himself in the investigation.  Samaan contends that as a result of this alleged

conflict, Wolf failed to vigorously cross examine Mohammad during the evidentiary hearing on

the motion to dismiss.  Samaan argues that Wolf should have questioned Mohammad about

whether he had been admitted to the federal bar at the time he represented Samaan.

"A defendant's claim that he was denied effective assistance of counsel because his

attorney labored under a conflict of interest is considered under several different standards."

Noe v. United States, 601 F.3d 784, 789 (8th Cir. 2010).  For a defendant who raises a claim of

conflict of interest arising from joint representation, prejudice is presumed if the defendant can

"show an actual conflict of interest that affected the adequacy of his representation."  Id. (citing

Cuyler v. Sullivan, 446 U.S. 335, 348-49 (1980)) (emphasis added).  Where, as here, an alleged

conflict does not involve joint representation, the Eighth Circuit has not yet determined whether

the presumed prejudice analysis of Cuyler applies, or if less stringent Strickland test applies.  Id.

at 790.

Samaan's claim fails under either standard.  Samaan cannot satisfy the Cuyler standard,

because he cannot demonstrate that Wolf's alleged conflict of interest affected the adequacy of

his representation.  The record shows that during the evidentiary hearing on the motion to dismiss, Wolf vigorously cross-examined Mohammad on the issue of whether he told Samaan that he would have full immunity in exchange for his cooperation.  See Mot. to Dism. Hr'g Tr. at 105-118.  Samaan also cannot satisfy the Strickland standard, because Wolf's cross examination of Mohammad fell well within the range of reasonable professional assistance.  Samaan's claims that his relationship with Mohammad created a conflict of interest are rejected.

In Ground 6, Samaan argues that Wolf labored under a conflict of interest because he represented R.I., an uncharged co-conspirator.  Mem. Supp. Mot. at 102-114.  Samaan alleges that Wolf was initially planning to have Samaan testify at trial to show that he was in a separate conspiracy, but that Wolf later canceled this defense plan and prevented Samaan from testifying when Wolf learned that Samaan would implicate R.I. in the separate conspiracy.  This claim fails because Samaan's "multiple conspiracies" defense was argued at trial and rejected by the jury.  Trial Tr. Vol. V [Docket No. 489] at 783-89.  In affirming Samaan's conviction, the Eighth Circuit held that "the government presented sufficient evidence of a single conspiracy involving Sesay, Sayonkon, and Samaan."  See Sesay, 937 F.3d at 1151.  Accordingly, to the extent, if any, that a conflict involving R.I. existed, it did not affect the adequacy of Wolf's representation, as required by Cuyler, and did not result in prejudice to Samaan, as required by Strickland.

In Ground 7, Samaan argues that Wolf was ineffective for not moving to suppress Samaan's August 16, 2012 statement made while in custody following his arrest by Columbia Heights police.  Def.'s Mem. Supp. Mot. at 119-124.  Samaan was not prejudiced by counsel's failure to move for suppression of his statement, because the Government did not use any of Samaan's interview statements against him.  During the August 2012 interview, Samaan denied

any wrongdoing and made no admissions.  The only information Samaan accurately relayed to investigators was that the car he was driving when he was arrested belonged to Fitzgerald.  Law enforcement was already aware of this information due to the vehicle's registration as well as documents recovered from the car.

In Ground 8, Samaan argues trial counsel was ineffective for not making a <u>Kastigar</u> objection.  <u>Id.</u> at 125-146.  As discussed above, no <u>Kastigar</u> violation occurred.  Accordingly, Samaan cannot show prejudice resulting from his trial counsel's failure to make a <u>Kastigar</u> objection.

In Ground 10, Samaan claims that his trial counsel was ineffective for failing to impeach testimony that was knowingly false, and for failing to subpoena witnesses who would have discredited the Government's witnesses.  <u>Id.</u> at 155-172.  Samaan's allegations of false testimony are largely based on insignificant discrepancies in witness testimony.  Trial counsel's strategy in not attacking these discrepancies did not fall below an objective standard of reasonableness.  Additionally, Samaan cannot show that the outcome would have been different had trial counsel challenged the witnesses on the issues identified by Samaan.

In Ground 12, Samaan argues that trial counsel committed numerous professional and ethical errors, and that the cumulative effect of the errors amounted to a constructive denial of counsel.  <u>Id.</u> at 184-195.  Among the many claims listed in Ground 12, Samaan contends that Wolf was being treated for cancer while representing Samaan, and that Wolf's illness and treatments negatively impacted his ability to represent Samaan.  This allegation is contradicted by the filings and transcripts in this case, which show that Wolf provided thorough, competent, and vigorous representation to Samaan.

Also in Ground 12, Samaan claims in his opening brief that Wolf failed to convey a plea offer of 36 months from the Government.  Samaan contends that the only offer conveyed by Wolf was for 63-78 months for the initial Indictment charging him with one count of bank fraud conspiracy, and 87-101 months after the Second Superseding Indictment charging him with one count of bank fraud conspiracy and one count of identity theft.  Def.'s Mem. Supp. Mot. at 186.

The Government responds that no 36-month offer was extended.  The Government states that it made an offer to Samaan in March 2017, before the Second Superseding Indictment was filed, that included a plea to Count 1 of the initial Indictment (bank fraud conspiracy) and allowed Samaan credit for acceptance of responsibility.  Gov't Resp. [Docket No. 626] at 37; Gov't Ex. 10 [Docket No. 626, Attach. 10].  The plea offer specified a sentencing guidelines range of 57-71 months, but acknowledged that the Court may depart from the applicable guidelines range and that "the Defendant will be sentenced pursuant to the Court's determination."  Gov't Ex. 10.  The plea offer also stated that "pleading guilty may have consequences with respect to [Defendant's] immigration status, including removal or deportation, if he is not a citizen of the United States."  Id.

Samaan argues in his Reply [Docket No. 632] that the plea offer of 57-71 months on the initial Indictment was never conveyed to him.  Reply at 114.  Although Wolf is not alive to speak to this assertion, the record suggests that the offer of 57-71 months was conveyed.  In a July 12, 2017 email, Wolf informed the prosecutor that Samaan "says he is going to trial" and will not plead guilty.  Gov't Ex. 11 [Docket No. 626, Attach. 11].

Moreover, even if Samaan could show that the plea offer of 57-71 months was not conveyed to him, he cannot show a substantial likelihood that he would have accepted the offer

20

had it been conveyed.  "To show prejudice from ineffective assistance of counsel where a plea

offer has lapsed or been rejected because of counsel's deficient performance, defendants must

demonstrate a reasonable probability they would have accepted the earlier plea offer had they

been afforded effective assistance of counsel."  Missouri v. Frye, 566 U.S. 134, 147 (2012).  "'A

reasonable probability is a probability sufficient to undermine confidence in the outcome,' which

'requires a substantial, not just conceivable, likelihood of a different result.'"  Allen v. United

States, 854 F.3d 428, 432 (8th Cir. 2017) (quoting Cullen v. Pinholster, 563 U.S. 170, 189

(2011)).

Here, Samaan does not state that he would have accepted an offer of 57-71 months.

Indeed, he acknowledges that he rejected a plea offer with a substantially similar guidelines

range.  Further, the record shows that Samaan told his attorney he was going to trial.  Gov't Ex.

11.  The record also establishes that Samaan was concerned that pleading guilty would

jeopardize his immigration status.  Samaan Aff. [Docket No. 597]  27; Def.'s Mem. Supp. Mot.

at 11.  Accordingly, to the extent, if any, that counsel failed to relay the 57-71 month plea offer,

Samaan cannot show prejudice because he has failed to prove by a substantial likelihood that he

would have accepted the offer.

Samaan alleges that Wolf committed several other professional and ethical errors, and

that the cumulative effect of the errors resulted in a constructive denial of counsel.  The Court

has considered all allegations and arguments in Ground 12 and concludes that the claim lacks

merit.

### 4.  Ground 9:  Constitutionality of Search of Hotel Guest Registry

Samaan argues that the Columbia Heights police officers' inspection of the Starlight

Motel's guest registry was an unreasonable search that violated the Fourth Amendment.  Def.'s

Mem. Supp. Mot. at 147-154.  Samaan raised this argument prior to trial in a motion to suppress

the fruits of the registry search.  This Court denied the motion and the Eighth Circuit affirmed.

Both courts held that Samaan did not have a constitutionally protected privacy interest in the

information he provided to the Starlight Motel for use in their registry.  Sesay, 937 F.3d at 1152;

United States v. Sayonkon, No. 16-265, 2017 WL 11426870, at *8 (D. Minn. Jan. 24, 2017),

report and recommendation adopted, No. 16-265, 2017 WL 11426868 (D. Minn. Mar. 21, 2017).

        Several months after Samaan's appeal had been decided, the Minnesota Supreme Court

held that under Article I, section 10 of the Minnesota Constitution, a hotel guest has a reasonable

expectation of privacy in the guest registry information they provide to the hotel.  State v.

Leonard, 943 N.W.2d 149, 156-59 (Minn. 2020).  In arriving at this holding, the Court

repeatedly noted that Article I, Section 10 of the Minnesota Constitution provides greater

protection against suspicionless searches than the Fourth Amendment of the Federal

Constitution.  Id. at 155-56.  Samaan argues that under Leonard, the Columbia Heights police

officers' search of the hotel guest registry violated his rights under the Minnesota Constitution,

and that all evidence stemming from the search of the registry must be suppressed.

        Samaan's argument is misplaced because the "exclusionary rule only requires a federal

court to exclude evidence seized in violation of the Federal Constitution."  United States v. Bell,

54 F.3d 502, 503 (8th Cir. 1995).  "Because states may impose rules for arrests, searches, and

seizures that are more restrictive than the Federal Constitution, state law violations do not

necessarily offend the Federal Constitution."  Id. at 503-04.  When a federal court must decide

whether to exclude evidence obtained by a state officer through an arrest, search, or seizure, "the

22

appropriate inquiry is whether the arrest, search, or seizure violated the Federal Constitution, not whether the arrest, search, or seizure violated state law." Id. at 504. The Eighth Circuit has already held that an officers suspicionless search of a hotel guest registry does not violate the Fourth Amendment of the Federal Constitution. Sesay, 937 F.3d at 1152. Consequently, evidence from the search of the registry need not be suppressed.

### 5. Ineffective Assistance of Sentencing and Appellate Counsel

Samaan also claims that Glenn Bruder ("Bruder"), the attorney appointed to represent Samaan on sentencing and appeal, provided ineffective assistance. 2255 Mot. at 9; Reply at 120-124; Jan. 4, 2021 Letter to Court at 17-18. Samaan contends that Bruder was ineffective at the sentencing hearing by failing to object to testimony by Agent Randall Flint ("Flint") about Samaan's connection to counterfeit checks drawn on a Westfall Auto Sales account. Reply at 121-22; 2255 Mot. at 9; Jan. 4, 2021 Letter to Court at 17. Samaan argues that Flint's testimony was influenced by information Samaan had provided in his October 2012 proffer. However, agents were aware of Samaan's connection to the Westfall Auto Sales checks in May 2012. Specifically, Samaan deposited a counterfeit Westfall Auto Sales check at TCF on May 12, 2012, and he had two more such checks in his wallet when he was arrested on May 29, 2012.

Samaan also argues that Bruder failed to raise claims in this Court and on appeal that: 1) Wolf's relationship with Mohammad constituted a conflict of interest; and 2) the Government failed to inform Samaan that Mohammad was not "licensed." Reply at 123-24; 2255 Mot. at 9; Jan. 4, 2021 Letter to Court at 18. Samaan cannot show that the outcome would have been different had Bruder raised these claims, because the claims lack merit.

### IV.  MOTIONS TO COMPEL

Samaan has filed a Motion to Compel Evidence [Docket No. 602], an Amended Motion to Compel Evidence [Docket No. 624], and a Motion to Compel a Bill of Particulars [Docket No. 611].  Samaan contends that the evidence and information that he seeks through these motions will allow him to prove that the Government used information from his October 2012 proffer and cooperation against him.  As discussed above, the record establishes that the information used to indict, convict, and sentence Samaan was obtained before October 2, 2012.

### V.  Evidentiary Hearing

Samaan requests an evidentiary hearing to address the issues in his 2255 Motion.  See Mot. Evid. Hearing [Docket No. 634].  An evidentiary hearing is not warranted, as the 2255 Motion and the files and records in this case conclusively show that Samaan is not entitled to § 2255 relief.  28 U.S.C. § 2255(b); Noe, 601 F.3d at 792.

### VI. CERTIFICATE OF APPEALABILITY

The Court may grant a certificate of appealability only where a defendant has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Tiedeman v. Benson, 122 F.3d 518, 523 (8th Cir. 1997).  To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  The Court finds it unlikely that another court would decide the issues raised in this 2255 Motion differently, or that any of the issues raised in Samaan's 2255 Motion would be debatable among reasonable jurists.  Thus, the Court declines to grant a certificate of appealability.

## VII.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, IT IS

HEREBY ORDERED that:

1.      Defendant Saddam Samaan Daoud Samaan's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence [Docket No. 589] is **DENIED**;

2.      Samaan's Motion to Compel Evidence [Docket No. 602] is **DENIED**;

3.      Samaan's Motion to Expand Record [Docket No. 603] **GRANTED**;

4.      Samaan's Motion to Compel Bill of Particulars [Docket No. 611] is **DENIED**;

5.      Samaan's Motion to Amend Motion to Compel [Docket No. 624] is **DENIED**;

6.      Samaan's Motion for Evidentiary Hearing [Docket No. 634] is **DENIED**; and

7.      A certificate of appealability shall not issue.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:


s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT COURT

Dated:  September 7, 2021

25